UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------
JOSEPH VIDAL,

                                        Plaintiff,

                                                                **OPINION & ORDER**

                - against -
                                                                16-CV-5745 (CS)

JACKELINE VALENTIN,

                                        Defendant.
    -----------------------------------------------------------

Appearances:

Benjamin J.A. Sauter
Sara Gribbon
Kobre & Kim LLP
New York, New York
*Counsel for Plaintiff*[1]

Neil Shevlin
Assistant Attorney General
Office of the Attorney General of the State of New York
New York, New York
*Counsel for Defendant*

Seibel, J.

        Before the Court is Defendant's motion for summary judgment.  (Doc. 61.)

I.      **BACKGROUND**

        The following facts are based on the parties' Local Civil Rule 56.1 statements, replies,

and supporting materials, and are undisputed except as noted.

        New York State Department of Corrections and Community Supervision ("DOCCS")

Directive 4422 ("Offender Correspondence Program") contains the following relevant

provisions:

---

[1] The Court thanks Plaintiff's counsel for taking on Plaintiff's representation *pro bono*.

- "The sending and receiving of mail by offenders will be restricted only to the extent necessary to prevent a threat to the safety, security, and good order of the facility or the safety or well being of any person, and to prevent unsolicited and unwanted mail." (Doc. 65 ("Russo Decl.") Ex. A ¶ II(C).)

- "Except for oversize envelopes and parcels, offender-to-offender correspondence and correspondence specified in . . . [Directive 4421], . . . outgoing correspondence may be sealed by the offender." (*Id.* ¶ III(B)(7).)

- "Oversize correspondence, defined as mail which cannot be enclosed in a standard business envelope, shall be inspected in the presence of the offender by a designated security staff person for the presence of contraband." (*Id.* ¶ (B)(8).)

- [O]utgoing mail purporting to be privileged correspondence will not be considered to be privileged correspondence until it has been placed in the control of the administration[2] for processing. (*Id.* ¶ III(A).)

---

[2] The term "administration" is not defined in DOCCS Directive 4422. Anthony Russo, currently employed by DOCCS as the Deputy Superintendent for Security at the Green Haven Correctional Facility ("Green Haven"), averred that the term "administration" refers to mail room staff. (Russo Decl. ¶ 8.) Plaintiff disputes this fact, pointing to Defendant's deposition testimony during which she explained that the term "administration" refers to "civilian employees," which means "somebody who's not in uniform." (Doc. 67 ("Sauter Decl.") Ex. A ("Valentin Tr.") at 102:19-25.) But the testimony continues in a vein consistent with Russo's position:

Q: So your interpretation of [DOCCS Directive 4422 ¶ III(A)] is that outgoing mail is not privileged until it's in the control of those persons in that building?

A (Valentin): The mailroom personnel, yes.

(*Id.* at 103:15-19.) Plaintiff also points to Defendant's October 27, 2014 memorandum where she wrote: "[P]er directive, legal mail (oversized) is not considered privileged until it reaches the facility administrator." (Sauter Decl. Ex. T.) Plaintiff claims that the "facility administrator" does not refer only to mail room personnel. (Doc. 68 ("P's 56.1 Resp.") ¶ 15.) (Citations to Plaintiff's 56.1 Response refer to the paragraphs under the heading "Plaintiff's Responses to Defendant's Statements of Material Facts," which begins on page two of Document 68.)

Neither side explains why the definition of the term "administration" affects the outcome of the instant motion, and I do not consider the term's definition material to this case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (fact is material when it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment).

Further, DOCCS Directive 4421 ("Privileged Correspondence") provides that once outgoing privileged correspondence has been sealed by an inmate, it "shall not be opened, inspected, or read without express written authorization from the facility Superintendent." (*Id.* Ex. B ¶ 721.3(A)(2).)

Plaintiff Joseph Vidal is an inmate currently incarcerated by DOCCS at the Elmira Correctional Facility. (P's 56.1 Resp. ¶ 1.) From October 2014 to March 2015, Plaintiff was incarcerated at Green Haven. (*Id.*) Defendant Jackeline Valentin has been employed as a Correction Officer ("CO") by DOCCS since January 7, 2013. (*Id.* ¶ 2.) Defendant was assigned to Green Haven in April or May 2013, but she is no longer working there because she has been "out on medical" leave as of September 2017. (*Id.*; Valentin Tr. at 8:14-21.)

On October 12, 2014, Defendant worked at Green Haven as the A officer on E Block during the 7:00 a.m. to 3:00 p.m. shift. (P's 56.1 Resp. ¶ 3.) That day, Plaintiff approached Defendant and asked her to sign a disbursement form for a sealed 8.5" x 11" envelope marked "legal mail" that Plaintiff stated he wanted to send to his attorney. (P's 56.1 Resp. ¶ 4; Sauter Decl. Ex. B ("Vidal Decl.") ¶ 7.) Because a standard business envelope is approximately 9" x 4", Plaintiff's envelope was oversized under the applicable regulation, and thus subject to inspection. (*See* Russo Decl. Ex. A ¶ III(B)(7)-(8).) Defendant advised Plaintiff that she could not sign the disbursement form unless he agreed to open the envelope to allow Defendant to inspect the contents. (P's 56.1 Resp. ¶ 5.) Defendant claims that she told Plaintiff she needed to inspect his envelope for contraband and gang paraphernalia, (Doc. 66 ("Valentin Decl.") ¶ 4), but Plaintiff disputes that Defendant told him why she needed to inspect the envelope, (Vidal Decl. ¶ 4; P's 56.1 Resp. ¶ 5). Plaintiff refused to open his envelope and left. (P's 56.1 Resp. ¶ 6.)

That same day, Plaintiff submitted a letter to the facility Superintendent. (*Id.* ¶ 7; Valentin Decl. Ex. A (the "Letter").)[3] On October 14, 2014, Plaintiff filed a grievance with Green Haven. (P's 56.1 Resp. ¶ 8; Valentin Decl. Ex. B (the "Grievance").) In both his Letter and Grievance, Plaintiff complained that Defendant had acted improperly on October 12, 2014, when she informed Plaintiff she would not sign the disbursement form unless he opened the envelope so that she could review its contents. (P's 56.1 Resp. ¶ 9.) The Letter also asserted that Defendant had acted improperly by sharing her personal information with inmates. (*Id.* ¶ 10.) Specifically, Plaintiff alleged:

> [T]he fact that [Defendant] has problems with her black [A]merican husband, has either a cousin or cousin-in-law, if not in the block, in the facility, and that she shares her business or that she is from 190th Street, Washington Height[s], should not be affairs she should discuss. Employee Rule Manual, section 7.18, if I am not mistaken states that an officer should not display any familiarity with offenders.

(Letter at 2; *see* P's 56.1 Resp. ¶ 10.) Plaintiff testified that he included Defendant's personal information in his Letter to the Superintendent

> [b]ecause [Defendant] feels that she knows all the rules and regulations. Obviously, she doesn't because if somebody else knew her address on the block, she had to share it with somebody if somebody knows her and she hasn't told the superintendent that there's somebody here that knows her. That's why I did that. I have a right to do that. If an officer is acting – is out of place and not following his own rules and employee manual, I have a right to complain. That's what 139 says, Correctional 139. Find me guilty.

(Doc. 64 ("Shevlin Decl.") Ex. A at 113:14-114:2; P's 56.1 Resp. ¶ 11.) Defendant does not have a black American husband or a relative in the facility. (Valentin Decl. ¶ 11.) She does not live on 190th Street ██████████████████████████. (*Id.* ¶¶ 11-12.)

A supervisor shared copies of Plaintiff's Letter and Grievance with Defendant "[a]t some point in time following" the October 12 mail-related interaction between Plaintiff and Defendant.

---

[3] The Letter is incorrectly dated October 12, 2012.

(*Id.* ¶ 7.) Defendant does not remember when she received the documents, whether she received them at the same or different times, the identity of the supervisor who gave the Letter to her, or whether she was interviewed by a supervisor about them. (*Id.*) Defendant testified that she would have received the October 14 Grievance by the time she discussed the matter with another officer (Sergeant Malark), although she does not remember precisely when that discussion occurred either. (*Id.*; Valentin Tr. at 117:13-118:24, 133:25-134:25.)

Defendant testified that the filing of Plaintiff's October 14 Grievance did not bother her because inmate complaints are part of her job. (Doc. 71 Ex. A at 121:23-122:8.)[4] But she did testify that she became "upset" that Plaintiff █████████████████████ because she perceived Plaintiff's allegations to be an "attack on [her] character" insofar as they accused her of improperly "fraternizing with inmates" and made "a false statement about [her] sharing [her] personal information with other people." (Valentin Tr. at 122:5-8,151:7-153:5, 200:13-22.) She also stated that she was █████████████████████████████████████████████

███████████████████████████████████████████(*Id.* at 123:8-12, 162:5-11.)

On October 20, 2014, Plaintiff sent a note to civilian employee Alfia Alioto concerning her October 16, 2014 review of Plaintiff's inmate chart. (P's 56.1 Resp. ¶ 18.) In the note, Plaintiff commented, "I must admit you are a pretty down to Earth lady. Thank you. P.S. Keep it simple. I will try." (*Id.*) The note contained a written smiley face. (*Id.*) The next day (October 21), Sergeant Dragoon issued Plaintiff an Inmate Misbehavior Report charging him with violating Rule 107.11 ("Inmates shall not communicate messages of a personal nature to any employee."). (*Id.* ¶ 17.) That same day, Plaintiff was placed on keeplock status in his cell

---

[4] Doc. 71 Ex. A contains transcript excerpts from the same deposition as the Valentin Tr.

on E Block pending resolution of the charge against him.  (*Id.* ¶ 19.)[5]  The paperwork relating to

Sergeant Dragoon's Report asks, "Inmate confined/restricted for this report?" and the option

"Yes" is selected, with the date "10/20/14" specified.  (Russo Decl. Ex. C at 9.)[6]  On October 29,

2014, Captain Carey conducted a disciplinary hearing in connection with Sergeant Dragoon's

Report and Plaintiff's punishment was keeplock status for thirty days (with a start date of

October 20) and loss of privileges.  (*Id.* Ex. C at 1.)  Plaintiff describes the punishment he

received as "disproportionate" – although he provides no facts as to the typical punishment for

such an offense by an inmate with his history – and claims it is disputed whether there were other

factors that led to his keeplock status aside from Sergeant Dragoon's Inmate Misbehavior

Report.  (P's 56.1 Resp. ¶ 19.)  Plaintiff also disputes whether he actually violated Rule 107.11

and claims the issuance of the Inmate Misbehavior Report was part of a retaliatory scheme.  (*Id.*

¶¶ 17-19.)

On October 23, 2014, Plaintiff was issued two additional Inmate Misbehavior Reports for

his alleged continuing improper interactions with Alioto.  (P's 56.1 Resp. ¶ 20.)  The first

Report, issued by Alioto for an incident occurring on October 23, 2014, at approximately 9:15

a.m., charged Plaintiff with violating Rules 101.22 ("stalking") and 107.11 ("harassment").  (*Id.*

¶ 21.)  According to the Report, that morning Alioto had received a thank-you note from Plaintiff

attached to Plaintiff's yellow copy of the October 21, 2014 Inmate Misbehavior Report written

by Sergeant Dragoon.  (*Id.*)  Alioto said she feared for her safety.  (*Id.*)  Plaintiff disputes that he

---

[5] An inmate on keeplock status is confined to his cell for twenty-three hours per day, and is
allowed one hour of recreation per day.  (P's 56.1 Resp. ¶ 19.)

[6] All page citations to exhibits attached to the Russo Declaration refer to the pagination
generated by the Court's Electronic Case Filing System.

violated Rules 101.22 and 107.11 and whether the alleged thank you note was the true or sole reason for the cited Inmate Misbehavior Report. (*Id.*)

Later that day, at approximately 5:00 p.m., Sergeant Kutz issued an additional Inmate Misbehavior Report to Plaintiff for allegedly having sent inappropriate correspondence to Alioto. (*Id.* ¶ 22.) That ticket charged Plaintiff with violating Rules 107.11 ("harassment") and 180.11 ("Facility Correspondence Guidelines"). (*Id.*) Plaintiff again disputes that he violated those rules and whether the alleged correspondence was the true or sole reason for the cited Inmate Misbehavior Report. (*Id.*)

On October 23, 2014, Defendant issued an Inmate Misbehavior Report, stating that Plaintiff's "grievance/complaint" "discussed my personal information and stated my address (cross street) and town. I have never; nor will I ever discuss or provide my personal/physical address or information with any inmate." (Russo Decl. Ex. E at 5 ("Defendant's Report").) Defendant's Report cites Plaintiff for violating Rule 113.26 ("Personal information of a current or former employee"), which provides:

> An inmate shall not, without written authorization of the superintendent, solicit, possess or exchange personal identifying information (*e.g.* social security number, home address, private e-mail address or home telephone number) belonging to a person who is a present or former employee of the department or presently or formerly employed in a department facility, or to any member of the person's household, unless the inmate is an immediate family member of such person.

(P's 56.1 Resp. ¶¶ 23-24.) Defendant's Report says that Plaintiff's housing location at the time was "SHU 1," (Defendant's Report), which I understand to be the Special Housing Unit.

Plaintiff disputes that he violated Rule 113.26 and disputes that the alleged Rule violation was the true or sole reason for Valentin's Inmate Misbehavior Report. (P's 56.1 Resp. ¶ 23.) Specifically, the parties dispute whether "190th Street, Washington Height[s]" amounts to "personal identifying information" as contemplated by Rule 113.26, and whether the mere

"possession" of such information is sufficient to violate Rule 113.26. (*Id.*; Doc. 69 ("P's Opp.")
at 17-19.) On October 27, 2014, Defendant provided a memorandum to Sergeant Malark
responding to Plaintiff's Grievance and denying any wrongdoing. (Valentin Decl. Ex. E.)

On October 23, 2014, Plaintiff was sent to SHU where he stayed until March 3, 2015.
(Vidal Decl. ¶ 16.) Plaintiff claims that before he was sent to SHU, Defendant stopped by
Plaintiff's cell and said, "You are going to SHU." (*Id.* ¶ 17.)[7] The day after Plaintiff was sent to
SHU, Plaintiff says Defendant appeared in SHU and said, "Look at you now" and "Pendejo yo
no soy de 190th y Washington Heights," (*id.*), which I understand to mean, "Idiot, I'm not from
190th and Washington Heights." Plaintiff also attests that on March 6, three days after he was
released from SHU, he was beaten by COs and sent back to SHU. (*Id.* ¶ 18.) Plaintiff says that
on the same day, Defendant visited Plaintiff in SHU and "mock[ed] and taunt[ed]" him. (*Id.*)

On December 31, 2014, Captain Carey conducted two disciplinary hearings involving
Plaintiff. (P's 56.1 Resp. ¶ 27.) One concerned the October 23, 2014 Inmate Misbehavior
Report issued by Defendant, and the other concerned the two October 23, 2014 Inmate
Misbehavior Reports issued to Plaintiff in connection with his interactions with staff member
Alioto. (*Id.*) Following the first hearing Defendant's Inmate Misbehavior Report was dismissed.
(*Id.* ¶ 28; Russo Decl. Ex. E at 1.)

---

[7] Plaintiff's Amended Complaint says that Defendant told Plaintiff "You are going to SHU" at
9:55 a.m., (Doc. 26 ("AC") ¶ 29), but there is no evidence in the record – including Plaintiff's
Declaration – as to what time this occurred, and I cannot consider Plaintiff's unsworn, unverified
complaint on a motion for summary judgment. *See Trinidad v. N.Y.C. Dep't of Corr.*, 423 F.
Supp. 2d 151, 161 (S.D.N.Y. 2006) (unsworn materials are "an insufficient basis for opposing a
motion for summary judgment") (internal quotation marks omitted); *Dukes v. City of N.Y.*, 879 F.
Supp. 335, 343 (S.D.N.Y. 1995) ("[U]nsworn statements are not admissible to controvert a
summary judgment motion."). The time of the remark is not material in any event.

Following the hearing on the two Alioto-related Reports, Plaintiff was found guilty of the two charges of harassment (Rule 107.11) and the charge of a facility correspondence violation (Rule 180.11), and the allegation of stalking (Rule 101.22) was dismissed. (P's 56.1 Resp. ¶ 29; Russo Decl. Ex. D at 1.) Plaintiff's punishment was "six months (with two months suspended) in SHU (commencing October 23, 2014 to February 23, 2015), and six months loss of packages, phones, and commissary (commencing October 23, 2014 to April 23, 2015)." (P's 56.1 Resp. ¶ 30.)

On June 17, November 26, and September 28, 2013, pursuant to a practice whereby staff are to notify a supervisor if the staff member knows an inmate from the outside, (*see* Russo Decl. ¶ 29), Defendant submitted a total of four memoranda (submitting two on June 17) to the Deputy Superintendent of Security for Green Haven informing him that she recognized certain inmates from her life outside of DOCCS. (*Id.* ¶ 31; Sauter Decl. Ex. O.) In addition, Defendant learned that Plaintiff had obtained the personal information in the Letter from an inmate in J-block, nicknamed "Monstro," and tracked down his real name, Jose Padilla. (Valentin Tr. at 168:6-17.) Valentin testified that, having learned that Padilla, who she knew ██████████████████ (*id.* at 164:12), was in the facility, she submitted a "to/from," which is a memo, "explain[ing] the situation," (*id.* at 169:20-24), *i.e.*, that Padilla knew Defendant from her life outside of DOCCS, (*id.* at 164:12-15). DOCCS has no record of it, (P's 56.1 Resp. ¶ 31), but Defendant notes that Padilla was transferred to another jail, and there would be no other reason to move him except that she had submitted a to/from stating she knew him, (Valentin Tr. at 169:24-170:12).

On July 19, 2016, Plaintiff initiated this action. (Doc. 2.) He filed an amended complaint on March 23, 2017. (AC.) Following discovery, Defendant filed the instant motion for summary judgment. (Doc. 61.)

## II.   LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  A fact is "material" if it "might affect the outcome of the suit under the governing law . . . .  Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.*  On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence sufficient to satisfy every element of the claim."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]."  *Anderson*, 477 U.S. at 252.  Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . .

admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1).  Where an affidavit is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated." *Id.* 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008).  In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

## III.    DISCUSSION

### A.      First Amendment Retaliation

Plaintiff's Amended Complaint alleges that Defendant, in her individual capacity,[8] retaliated against him in violation of 42 U.S.C. § 1983 for exercising his right under the First Amendment to submit grievances and complaints.  (AC ¶¶ 1-2.)[9]  The Second Circuit has

---

[8] Plaintiff's AC alleges that Defendant was acting "in her individual and/or official capacity." (AC ¶ 62.)  Plaintiff's counsel clarified that Plaintiff's AC – which Plaintiff drafted before he acquired *pro bono* counsel – intended to assert a claim for damages against Defendant in her individual capacity and not her official capacity.  (P's Opp. at 24.)  Complaints made by *pro se* plaintiffs are to be examined with "special solicitude," interpreted "to raise the strongest arguments that they suggest," *Shibeshi v. City of N.Y.*, 475 F. App'x 807, 808 (2d Cir. 2012) (summary order) (emphasis and internal quotation marks omitted), and "held to less stringent standards than formal pleadings drafted by lawyers," *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (internal quotation marks omitted).  Accordingly, I interpret Plaintiff's Amended Complaint to allege a claim against Defendant in her individual capacity.

[9] Plaintiff's Amended Complaint also alleges violations under the Ninth and Fourteenth Amendments.  (AC ¶ 1.)  Plaintiff has offered no evidence to support this claim except to say that the First Amendment is incorporated against the States by the Fourteenth Amendment.  (P's Opp. at 22.)  Accordingly, to the extent Plaintiff alleges independent causes of action under the Ninth and Fourteenth Amendments, those claims are dismissed.

instructed district courts to "approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official – even those otherwise not rising to the level of a constitutional violation – can be characterized as a constitutionally proscribed retaliatory act." *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (internal quotation marks omitted); *see Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("Retaliation claims by prisoners are prone to abuse since prisoners can claim retaliation for every decision they dislike.") (internal quotation marks omitted); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) (skepticism warranted by "near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated").

To prevail on a First Amendment retaliation claim under 42 U.S.C. § 1983, a prisoner must demonstrate: "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected conduct and the adverse action." *Washington v. Gonyea*, 538 F. App'x 23, 26 (2d Cir. 2013) (summary order) (alteration and internal quotation marks omitted). Once a plaintiff has "carrie[d] that burden, the defendants must show by a preponderance of the evidence that they would have [taken the allegedly retaliatory action] even in the absence of the protected conduct." *Graham*, 89 F.3d at 79 (internal quotation marks omitted). If the defendant meets this burden, summary judgment is appropriate. *See Davidson v. Chestnut*, 193 F.3d 144, 149 (2d Cir. 1999). In other words, "[r]egardless of the presence of retaliatory motive, . . . a defendant may be entitled to summary judgment if he can show dual motivation, *i.e.*, that even without the improper motivation the alleged retaliatory action would have occurred." *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429

U.S. 274, 287 (1977)); *see Lowrance v. Achtyl*, 20 F.3d 529, 535 (2d Cir. 1994) (affirming dismissal on summary judgment because correction officer's actions were of mixed motives and "would have been issued on proper grounds alone"); *see also Sher v. Coughlin*, 739 F.2d 77, 81-82 (2d Cir. 1984) (affirming summary judgment dismissal of prisoner's retaliation claim where dual motivation existed for prisoner's transfer to another facility).

For purposes of this motion, Defendant does not contest that Plaintiff's Letter and Grievance constitute protected activity. (Doc. 63 ("D's Mem.") at 17 n.2.) That concession is well supported by case law. *See Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004) ("[Plaintiff] has sufficiently alleged . . . participation in protected activity: the use of the prison grievance system . . . ."); *Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988) ("[I]ntentional obstruction of a prisoner's right to seek redress of grievances is precisely the sort of oppression that section 1983 is intended to remedy.") (alterations and internal quotation marks omitted)); *Morgan v. Dzurenda*, No. 14-CV-966, 2017 WL 1217092, at *12 (D. Conn. Mar. 31, 2017) ("The filing of grievances is a constitutionally protected activity . . . .") (internal quotation marks omitted); *Pledger v. Hudson*, No. 99-CV-2167, 2005 WL 736228, at *4 (S.D.N.Y. Mar. 31, 2005) ("A prisoner's filing of an internal prison complaint against an officer is protected by the First Amendment . . . ."). Thus, Plaintiff has satisfied the first element of his First Amendment retaliation claim.

Additionally, Defendant does not contest that Plaintiff meets the causation prong of the First Amendment retaliation standard, because Defendant concedes that she issued the Inmate Misbehavior Report to Plaintiff in response to the Letter to the Superintendent. (D's Mem. at 17 n.2.)

Accordingly, the only hurdle Plaintiff must clear to establish his *prima facie* case of retaliation is whether he suffered an adverse action. The Second Circuit "define[s] adverse action objectively, as retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising constitutional rights." *Gill*, 389 F.3d at 381 (alterations, internal quotation marks, emphasis omitted). If the retaliatory conduct does not rise to that level, "the retaliatory act is simply *de minimis*, and therefore outside the ambit of constitutional protection." *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 366 (S.D.N.Y. 2011) (internal quotation marks omitted). Defendant argues that Plaintiff's stay in SHU cannot satisfy the adverse action element, because Plaintiff was transferred to SHU because of the Inmate Misbehavior Reports issued by Sergeant Kutz and Alioto, and not Defendant's Report. (D's Mem. at 17-18.)

In response, Plaintiff argues that Defendant's filing of an Inmate Misbehavior Report constituted an adverse action in itself. (P's Opp. at 15.) Plaintiff is correct that "a plaintiff's allegation that a defendant issued a false misbehavior report in response to the plaintiff's protected activity can support a claim of unlawful retaliation," *Ward v. Lee*, No. 16-CV-1224, 2018 WL 4610682, at *6 (N.D.N.Y. July 3, 2018), *report and recommendation adopted*, 2018 WL 3574872 (N.D.N.Y. July 25, 2018); *see Franco*, 854 F.2d at 589 (false disciplinary charges as adverse actions); *Reed v. Doe No. 1*, No. 11-CV-250, 2012 WL 4486086, at *5 (N.D.N.Y. July 26, 2012) (same), *report and recommendation adopted*, 2012 WL 4486085 (N.D.N.Y. Sept. 27, 2012). But Plaintiff offers no evidence that Defendant's Report was actually false. Defendant's Report cites Plaintiff for violating Rule 113.26 and states that Plaintiff's Grievance "discussed my personal information and stated my address (cross street) and town" and wrongly accused her of sharing that information with an inmate. (Defendant's Report.) Plaintiff does not

dispute that Defendant in her Report accurately described his Letter.[10]  Plaintiff now disputes

that the information regarding 190th Street constituted "personal information," but he plainly and

concededly included it in his Letter to accuse Defendant of sharing personal information with

inmates.  (P's 56.1 Resp. ¶ 11; Letter at 2.)  This hardly amounts to Defendant's Report being

"false."  Because Plaintiff offers no evidence that Defendant's misbehavior report was actually

false and does not otherwise contest the accuracy of Defendant's Report's contents, Defendant's

motion for summary judgment is granted to the extent Plaintiff's theory is that the adverse action

was a false misbehavior report.  *See Bilal v. White*, 494 F. App'x 143, 147 (2d Cir. 2012)

(summary order) ("[Plaintiff's] failure to adduce any evidence that the disciplinary charges were

in fact false supports summary judgment for defendant on the merits of that claim."); *Charles v.

Rockland Cty. Office of the Sheriff*, No. 16-CV-166, 2019 WL 1299804, at *5 (S.D.N.Y. Mar.

21, 2019) ("[A]lthough the filing of false misbehavior reports can constitute an adverse action,

plaintiff offers no evidence these misbehavior reports were actually false.") (emphasis omitted),

*appeal docketed*, No. 19-1041 (2d Cir. Apr. 22, 2019); *Pledger* 2005 WL 736228, at *5

(declining to find adverse action where plaintiff "admitted to the content of the [misbehavior]

report and plead guilty to one of the charges in it").

      Plaintiff next argues that Defendant's Report constituted an adverse action regardless of

its truthfulness and "regardless of the actual penalty imposed."  (P's Opp. at 16-17.)  But

Plaintiff points to no cases – and I know of none – in which a court found that the filing of a non-

falsified misbehavior report alone, without evidence of other repercussions, amounted to an

adverse action.  In fact, courts have held that misbehavior reports do not constitute adverse

---

[10] Plaintiff admits that he heard from another inmate that Defendant lived on 190th Street in
Washington Heights and does not purport to have been present when that inmate obtained the
information.  (Vidal Decl. ¶ 11.)

actions because they are "*de minimis*: they do not constitute penalties that would deter a similarly situated prisoner of ordinary firmness from exercising his constitutional rights." *Bartley v. Collins*, No. 95-CV-10161, 2006 WL 1289256, at *7 (S.D.N.Y. May 10, 2006) (finding misbehavior report that resulted in plaintiff's temporary loss of privileges did not amount to adverse action but misbehavior report that resulted in keeplock confinement for ten days did). Typically, courts require a showing of additional punishment above the filing of a misbehavior report to find an adverse action. *Gill*, 389 F.3d at 383 ("[A] plaintiff asserting First Amendment retaliation must allege some sort of harm . . . ."); *see Washington v. Chaboty*, No. 09-CV-9199, 2015 WL 1439348, at *10 (S.D.N.Y. Mar. 30, 2015) ("The filing of the misbehavior report and the disciplinary sanction of 65 days in the S.H.U. constitute adverse actions that satisfy the second element of a retaliation claim."); *cf. Bilal*, 494 F. App'x at 147 (in standing context, fabricated misbehavior report insufficient to show adverse action because "the petitioning prisoner must adduce evidence of some other harm"); *McFadden v. Friedman*, No. 12-CV-685, 2015 WL 5603433, at *13 (N.D.N.Y. Sept. 23, 2015) ("even if plaintiff were issued a false contraband receipt, the injury is *de minimis* and insufficient to show that he suffered an adverse action" where "plaintiff fail[ed] to allege that he received any punishment or reprimand arising out of the seizure of contraband"); *Pledger*, 2005 WL 736228, at *5 (correction officer's issuance of unfavorable evaluation of prisoner and threat to place him in SHU was not an adverse action).

Plaintiff argues that "[a] retaliatory misbehavior report would deter an inmate's use of the grievance system irrespective of the punishment that is eventually meted out." (P's Opp. at 16.) But the only case Plaintiff cites in support of this argument is *Brown v. Crowley*, 312 F.3d 782 (6th Cir. 2002). There, fact issues precluded a finding that the issuance of a "major misconduct

charge," by itself, was not an adverse action because "the risk of such severe sanctions for raising a legitimate complaint would deter a person of ordinary firmness from continuing to engage in that [protected] conduct." *Id.* at 789 (internal quotation marks omitted) (alteration in original). But there the charge of misconduct was plainly unjustified. *See id.* at 783-84 (prisoner charged with filing false report that prison officials embezzled his funds when they docked his inmate account for a debt he did not owe). In any event, the Sixth Circuit's decision is not binding here, and as discussed, no cases in this Circuit hold that the filing of a misbehavior report is, without additional punishment, sufficient to find an adverse action. Further, were an accurate misbehavior report alone a proper basis for a retaliation claim, one can readily imagine the interference with legitimate prison administration. *See Graham*, 89 F.3d at 79 ("A finding of sufficient permissible reasons to justify state action is readily drawn in the context of prison administration where we have been cautioned to recognize that prison officials have broad administrative and discretionary authority."). Accordingly, I reject Plaintiff's theory that the filing of a misbehavior report alone is sufficient to establish an adverse action.[11]

Confinement in the SHU is an adverse action. *See, e.g.*, *Smith v. Hash*, No. 904-CV-74, 2006 WL 2806464, at *6 (N.D.N.Y. Sept. 28, 2006). But the paperwork associated with the three Inmate Misbehavior Reports Plaintiff received on October 23, 2014, makes clear that Plaintiff was transferred to SHU as a result of Inmate Misbehavior Reports associated with Plaintiff's inappropriate communication with Alioto, not Defendant's Report. (Russo Decl. Ex. D at 1.)[12] In fact, when Defendant filled out the Inmate Misbehavior Report, Plaintiff's housing

---

[11] Nor do the alleged inappropriate comments by Defendant rise to the level of adverse action. *See Roseboro*, 791 F. Supp. 2d at 375 (collecting cases).

[12] Alioto's report indicates that Plaintiff was moved from keeplock status to the SHU due to the incident. (Russo Decl. Ex. D at 6.) The records of the disciplinary hearing confirm the same.

location was listed as "SHU 1," indicating that Plaintiff was already in SHU at the time she filed her Report. And the record is equally clear that Plaintiff's continued stay in SHU occurred because of the Alioto-related Reports. On December 31, 2014, following the hearing, Defendant's Report was dismissed. (P's 56.1 Resp. ¶ 28; Russo Decl. Ex. E at 1.) But following the hearing on the two Alioto-related Reports, Plaintiff was found guilty of two counts of harassment (Rule 107.11) and one count of facility correspondence violation (Rule 180.11), but not guilty of stalking (Rule 101.22). (P's 56.1 Resp. ¶ 29; Russo Decl. Ex. D at 1.) Plaintiff's punishment was six months (with two months suspended) in SHU (commencing October 23, 2014, to February 23, 2015), and six months loss of packages, phones, and commissary (commencing October 23, 2014, to April 23, 2015). (P's 56.1 Resp. ¶ 30; Russo Decl. Ex. D at 1.) Thus, the evidence shows that Plaintiff's stay in SHU was because of the two incidents related to his inappropriate communication with Alioto, not because of Defendant's Report. Without a showing of facts from which a jury could conclude that Plaintiff was sent to SHU because of Defendant's actions, Plaintiff has not satisfied the adverse action element of his *prima facie* case, and Defendant's motion for summary judgment must be granted.

Even if Plaintiff had established his *prima facie* First Amendment retaliation claim, Defendant would still be entitled to summary judgment. Once a plaintiff carries his *prima facie* burden, the burden shifts to the defendant to show by a preponderance of the evidence on the undisputed facts that the plaintiff "would have been disciplined even in the absence of the protected conduct." *Harnage v. Brighthaupt*, 168 F. Supp. 3d 400, 414 (D. Conn. 2016), *aff'd*, 720 F. App'x 79 (2d Cir. 2018) (summary order); *see Graham*, 89 F.3d at 81. To satisfy her

---

(*Id.* Ex. D at 2.) Defendant's Report indicates that Plaintiff was not restricted as a result of the incident, (*id.* Ex. E at 5), and the hearing records confirm the same, (*id.* Ex. E at 1).

burden, "it is not enough that [Defendant] allege[s] that the allegedly retaliatory actions could have been taken absent a retaliatory animus – *i.e.*, that there was a possible legitimate basis for the challenged actions. Rather, [Defendant] must establish that the actions would have been taken, even absent impermissible motives." *Davis v. Rhoomes*, No. 07-CV-6592, 2010 WL 3825728, at *7 (S.D.N.Y. Sept. 30, 2010) (emphasis omitted).

Here, there is ample undisputed evidence that Plaintiff was sentenced to the SHU because of his inappropriate communications with Alioto. (*See* pages 17-18 above.) Defendant played no part in issuing the Inmate Misbehavior Reports related to these communications or at the disciplinary hearing as a result of which Plaintiff was punished with six months in SHU. In other words, even absent Defendant's retaliatory motive, Plaintiff would have served the time in the SHU anyway. *See Osborne v. Grussing*, 477 F.3d 1002, 1006 (8th Cir. 2007) ("[W]e have repeatedly held that a prisoner fails to state a claim for retaliatory discipline when the alleged retaliation arose from discipline imparted for acts that a prisoner was not entitled to perform, *i.e.*, for violations of prison rules.") (internal quotation marks omitted); *Henderson v. Baird*, 29 F.3d 464, 469 (8th Cir. 1994) ("[I]f the discipline which the prisoner claims to have been retaliatory was in fact imposed for an actual violation of prisoner rules or regulations, then the prisoner's claim that the discipline was retaliatory in nature must fail.") (internal quotation marks omitted). And Plaintiff has provided no evidence of a broader retaliatory scheme such that any other prison employees had retaliatory intent toward Plaintiff.[13]

---

[13] Indeed, had such a scheme existed, it is highly unlikely that Defendant's Report would have been dismissed.

Defendant's comment to Plaintiff, "You are going to SHU," shows that Defendant knew that Plaintiff was going to SHU, but reflects nothing about why. Likewise, her alleged comments "Look at you now" and "Pendejo yo no soy de 190th y Washington Heights," while unprofessional, do not constitute evidence that Defendant had Plaintiff sent to the SHU.

Plaintiff spends much time arguing that Defendant had a retaliatory motive for writing her Report. But even if she did, that does not undermine the showing that the adverse action Plaintiff experienced was based on the Alioto misbehavior reports. So "the actions would have been taken, even absent the impermissible motives." *Davis*, 2010 WL 3825728, at *7 (emphasis omitted). Plaintiff also spends much time arguing that he did not violate Rule 113.26. Again, even if true, Defendant has still shown that Plaintiff would have been sent to SHU anyway. Further, even if Plaintiff's interpretation of Rule 113.26 is correct, Defendant's interpretation was not unreasonable, as discussed in the next section.

Accordingly, Defendant has established by a preponderance of the undisputed evidence that Plaintiff would have been disciplined even in the absence of any retaliatory motive, entitling her to summary judgment.[14]

## B.  **Qualified Immunity**

Finally, Defendant argues that at the very least she is entitled to qualified immunity. Government officials exercising discretionary functions are entitled to qualified immunity shielding them from damages in a § 1983 suit "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known,"

---

[14] Plaintiff argues in part that the Court should deny summary judgment because Defendant's inconsistent testimony regarding the scope of Rule 113.26 "undermines her credibility and stated basis for filing the [Inmate Misbehavior Report]." (P's Opp. at 20-21.) I do not regard Defendant's testimony about the Rule to be necessarily inconsistent, but I will assume for the sake of argument that it is. Plaintiff cites to no cases in which a court used a defendant's shifting explanations as evidence of retaliatory conduct in the prison context. *Cf. Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846-47 (2d Cir. 2013) (reversing denial of summary judgment on plaintiff's Title VII retaliation claim, finding that the defendant's shifting explanations for why it fired plaintiff, combined with other evidence, precluded summary judgment). But even if inconsistent testimony about the scope of the Rule showed retaliatory animus, for reasons already discussed, Plaintiff would have been sent to SHU anyway. *See Coughlin*, 344 F.3d at 287-88.

*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982), or insofar as it was objectively reasonable for them to believe that their conduct did not violate such rights, *see Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987). "'Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments,' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (*quoting Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). A government official sued in his individual capacity is entitled to qualified immunity

> (1) if the conduct attributed to him was not prohibited by federal law; or (2) where that conduct was so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time it occurred; or (3) if the defendant's action was objectively legally reasonable in light of the legal rules that were clearly established at the time it was taken.

*Munafo v. Metro. Transp. Auth.*, 285 F.3d 201, 210 (2d Cir. 2002) (internal quotation marks, citations, and alterations omitted); *see Creighton,* 483 U.S. at 639 ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action assessed in light of the legal rules that were clearly established at the time it was taken.") (internal quotation marks and citation omitted). Summary judgment should be granted where "the defendant shows that no reasonable jury, viewing the evidence in the light most favorable to the [p]laintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law." *Husain v. Springer,* 494 F.3d 108, 131 (2d Cir. 2007) (internal quotation marks omitted).

Had Plaintiff's claims survived, Defendant would be entitled to qualified immunity. While case law establishes that retaliation for the exercise of the right to petition prison officials is improper, *see Farid v. Goord*, 200 F. Supp. 2d 220, 245 (W.D.N.Y. 2002), "[e]ven if the right

at issue was clearly established in certain respects, . . . an officer is still entitled to qualified immunity if officers of reasonable competence could disagree on the legality of the action at issue in its particular factual context," *Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007).  No case reads Rule 113.26 as Plaintiff claims it ought to be read.  Plaintiff argues that he did not violate Rule 113.26 because the information about Defendant that he possessed was not "personal identifying information" within the meaning of the Rule and because mere possession of information should not constitute a violation.  But Defendant's interpretation was objectively reasonable:  ███████████████████████████████████████████████████ ███████████████, or at least reasonable minds could differ on the point, and whether Plaintiff finds it fair or not, the regulation penalizes mere possession.[15]  At the very least, there was no clearly established law stating that what Plaintiff did – which Defendant accurately described in her Report – was *not* a violation of Rule 113.26.

Claims of retaliatory arrest and prosecution provide useful comparisons.  The Supreme Court recently declared that a "plaintiff pressing a retaliatory arrest claim must plead and prove the absence of probable cause for the arrest."  *Nieves v. Bartlett*, 139 S. Ct. 1715, 1724 (2019).  A similar rule applies in the context of retaliatory prosecutions.  *See Reichle v. Howards*, 566 U.S. 658, 666 (2012) ("[A] plaintiff cannot state a claim of retaliatory prosecution in violation of the First Amendment if the charges were supported by probable cause.").  Although the retaliatory act here is not an arrest or prosecution, the import of the rules is that where retaliation is alleged, if the allegedly retaliatory actor can show probable cause, the retaliation claim cannot stand, or if "arguable probable cause" is shown, the defendant is entitled to qualified immunity.

---

[15] Further, Plaintiff did not merely possess the information.  He used it to make false accusations of misconduct against a court officer.  (P's 56.1 Resp. ¶ 11; Letter at 2.)

*See, e.g.*, *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) ("Even if probable cause to arrest is ultimately found not to have existed, an arresting officer will still be entitled to qualified immunity from a suit for damages if he can establish that there was 'arguable probable cause' to arrest."). Here, in the absence of clearly established law that Plaintiff's conduct did not violate Rule 113.26, Plaintiff cannot show the equivalent of the absence of probable cause, or at least arguable probable cause, for Defendant's Report. Defendant would thus be entitled to qualified immunity had summary judgment otherwise been denied. *See Rodriguez v. Phillips*, 66 F.3d 470, 479 (2d Cir. 1995) (reversing denial of summary judgment where plaintiff had no clearly established First Amendment right to speak to officer).

## IV.   CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED. The Clerk of Court is respectfully directed to terminate the pending motion, (Doc. 61), enter judgment for Defendant, and close the case.

**SO ORDERED.**

Dated: July 2, 2019
         White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.